Michael Jason Lee, Esq. (State Bar No. 206110)
**LAW OFFICES OF MICHAEL JASON LEE, APLC**
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
Telephone: (858) 550-9984
Facsimile: (858) 550-9985
Email: michael@mjllaw.com

Christopher J. Beal, Esq. (State Bar No. 216579)
**DILLON MILLER AHUJA & BOSS, LLP**
5872 Owens Avenue, Suite 200
Carlsbad, California 92008
Telephone: (858) 587-1800
Facsimile: (858) 587-2587
Email: cbeal@dmablaw.com

Attorneys for Applicant,
2770095 Ontario, Inc.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Application of*<br><br>2770095 Ontario, Inc.<br><br>       Applicant,<br><br>For the Issuance of a Subpoena for the Taking of a Deposition and the Production of Documents for use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 | Case No.: **3:22-mc-80009**<br><br>**APPLICATION TO CONDUCT DISCOVERY PURSUANT TO 28 U.S.C. § 1782; MEMORANDUM OF POINTS AND AUTHORITIES** |

**TABLE OF CONTENTS**

APPLICATION …………………………………………...…………..1

MEMORANDUM OF POINTS AND AUTHORITIES ……………………………..2

I.    INTRODUCTION …………………………………………… 2

II.   STATEMENT OF FACTS ………………………………………3

    A. 277 Ontario ...............................................................3

    B. Overview of Affinitas' Business ……………………………..3

    C. Affinitas Engages New Line Processing, Zed Payments and Morgan as Payment Processors ……………………………………………5

    D. Issues with Missing and Outstanding Transactions ………………………..6

    E. Morgan's Claims of "Banking Issues" …………………………7

    F. Current Foreign Proceedings and Connection to Respondent Slack ………8

III.  THE CONTEMPLATED DISCOVERY …………………………………10

IV.  277 ONTARIO'S LOCATION……………………………………10

V.   THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS .. 10

    A. Applicant is an "Interested Person" …………………………...……11

    B. The Requested Discovery Is for Use in Conjunctions with Proceedings Before a Foreign Tribunal ………………………………………...11

    C. Respondent Slack Can Be Found in the Northern District of California …12

    D. Discretionary Considerations Merit Granting This Application ………….12

VI.  CONCLUSION …………………………………………………...14

APPLICATION TO CONDUCT DISCOVERY PURSUANT TO 28 U.S.C. § 1782

## TABLE OF AUTHORITIES

**Cases**

*Akebia Therapeutics, Inc. v. FibroGen, Inc.,*
  793 F.3d 1108 (9th Cir. 2015).....................................................................11

*Brandi-Dohorn v. IKB Deutsch Industriebank AG,*
  673 F.3d 76 (2d Cir. 2012)...........................................................................14

*In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf,*
  Case No. Ml 9-88, 2006 WL 3844464 (S.D.N.Y.  Dec. 29, 2006)..............13

*In re Application of Grupo Qummam*, No. M 8-85 (DC),
  2005 WL 937486 (S.D.N.Y. Apr. 22, 2005).................................................13

*In re Bayer AG,*
  146 F.3d 188 (3d Cir. 1998).........................................................................11

*In re Euromepa S.A.,*
  51 F.3d 1095 (2d Cir. 1995).........................................................................13

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004) ...............................................................11, 12, 13, 14

*John Deere Ltd. v. Sperry Corp.,*
  754 F.2d 132 (3d Cir. 1985).........................................................................11

*Republic of Kazakstan v. Biedermann Int'l,*
  168 F.3d 880 (5th Cir. 1999)........................................................................11

**Statutes**

§1782(a) .......................................................................................................13

1782 .............................................................................................................11

28 U.S.C. § 1782 ....................................................................................passim

28 U.S.C. §1782............................................................................................14

2770095 Ontario, Inc. ("277 Ontario" or "Applicant") by and through its undersigned counsel, hereby brings the instant Application to Conduct Discovery Pursuant to 28 U.S.C. § 1782 ("Application") for the entry of an order granting Applicant leave to conduct targeted discovery from Slack Technologies, Inc. ("Slack" or "Respondent") for use in pending Canadian litigation. This Application is supported by the Declarations of Michael Jason Lee, Esq. and Martin Audiffred. Applicant respectfully requests that this Application be granted in its entirety.

Dated: January 10, 2022

**LAW OFFICES OF MICHAEL JASON LEE, APLC**

*/s/ Michael Jason Lee*
Michael Jason Lee, Esq.
Michael@mjllaw.com
Attorney for Applicant, 2770095 Ontario, Inc.

**DILLON MILLER AHUJA & BOSS, LLP**

*/s/ Christopher J. Beal, Esq. (with permission)*
Christopher J. Beal, Esq
cbeal@dmablaw.com
Attorney for Applicant, 2770095 Ontario, Inc.

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.   INTRODUCTION

3

Applicant 277 Ontario respectfully requests that the Court grant the instant application

4

for the issuance of a subpoena for the production of documents for use in a foreign proceeding

5

under 28 U.S.C. § 1782.

6

Specifically, and as discussed further herein, Canadians Maxwell Dean Morgan and

7

Tricia Edwards are the principal defendants in a lawsuit before the Ontario Superior Court of

8

Justice.  That suit seeks to recover $1,110,476.75 presently owed to Applicant that has gone

9

missing through the course of dealing with a network of payment processing companies and

10

related entities in Canada.  (Declaration of Michael Jason Lee at ¶ 6) ("Lee Decl.").  A copy of

11

the Statement of Claim in that proceeding is attached to the Declaration of Michael Jason Lee

12

as **Exhibit A**.  Among other things, 277 Ontario claims that Morgan and Edwards converted

13

the funds owed to it through overt acts of fraud and conspiracy.  (*Id.*)

14

As is relevant here, on June 14, 2021, the Ontario Superior Court of Justice entered an

15

"Anton Piller Order" ("APO"), requiring Morgan and Edwards to permit representatives of 277

16

Ontario, as well as a team of independent search coordinators, data forensics experts, solicitors

17

and audio/visual recorders to enter and remain in the residences of Morgan and Edwards for

18

the purpose of identifying, inspecting, removing, and preserving certain evidence pertaining to

19

the underlying action.  (*Id.* at ¶ 7.)  A copy of the APO is attached to the Declaration of Michael

20

Jason Lee as **Exhibit B**.  (*Id.* at ¶ 8.)  On June 15, 2021, the APO was executed at the residences

21

of Morgan and Edwards.  (*Id.* at ¶ 9.)

22

In pertinent part, the independent data forensic experts concluded that:

23

- "The Slack program is used constantly in the operation of [Morgan and Edwards'

24

  payment processing business];"

25

- Morgan and Edwards used Slack up to seven minutes before the execution of the

26

  APO, but both Defendants failed to submit their Slack accounts for forensic

27

  review as required by the Order; and

28

///

- Morgan deleted the Slack application from his mobile phone, and deleted a Slack desktop shortcut prior to execution of the APO.

(*Id.* at ¶ 11.)

These actions, as well as attempts by Morgan and/or Edwards to otherwise destroy, conceal, alter, or fail to disclose electronically stored information covered by the Anton Pillar Order are the subject of a pending Motion for Contempt in the Ontario Superior Court of Justice. (*Id.* at ¶ 13.)

Through the instant application, Applicant seeks the aid of this Court in obtaining limited discovery from Slack concerning the accounts and services at issue for use in the Canadian proceeding.

## II.     STATEMENT OF FACTS

### A.     277 Ontario

Applicant 277 Ontario was created for the purpose of pursuing collection of the liquidated loss of approximately $1,100,000 suffered by Affinitas Medios de Pago S.A.P.I de C.V. ("Affinitas"). (*Id.* at ¶ 4.) Affinitas has assigned to Applicant all legal rights, causes of action, and authority to pursue collection of the loss. (*Id.* at ¶ 5.)

### B.     Overview of Affinitas' Business

Affinitas is a payment facilitator that sources and manages payment solutions for internet merchants. (Declaration of Martin Audiffred at ¶ 3) ("Audiffred Decl."). Affinitas' clients ("merchants") provide products and services to their respective customers in exchange for payments by Visa, Mastercard and/or other debit or credit cards. (*Id.*) Such cards are issued by a bank (the "issuing bank") which receives funds processed through the card payments including posting to the credit card account and then transmitting the amount of the payment, less fees kept by the bank, back to the merchants. (*Id.*) Affinitas is based in Mexico City. (*Id.*)

Merchants hire Affinitas to help them integrate and manage their web-based sales of goods and services which primarily support the on-line gaming industry internationally. (*Id.* at ¶ 4.) Affinitas can leverage its experience and global reach to the benefit of its merchant clients. (*Id.*)

Affinitas engages third-party businesses who work as intermediaries between banks and Affinitas' merchants in the role of a payment processor and at times as a "paymaster" (defined below). (*Id.* at ¶ 5.) A payment processor often has many clients whose customers pay for the merchants' respective products and services with debit and/or credit cards. (*Id.*) The payment processor receives card payments through an e-commerce, electronic gateway. (*Id.*) The funds from such e-commerce payments are held, allocated and accounted for in separate e-commerce merchant accounts. (*Id.*)

A payment processor, or paymaster, typically has an existing arrangement with a bank who acquires ("processes") the merchants' transactions through the electronic gateway, settles and clears the amounts in the merchants' accounts, and then transmits the merchants' funds, less the bank's fee, to the payment processor via bank transfer. (*Id.* at ¶ 6.) Typically, companies such as Affinitas will not know who the payment processor/paymasters' bankers are, as the arrangement of the payment processor/paymaster with their bankers is part of the payment processor/paymasters' marketplace added value. (*Id.*)

Upon receiving transfers from a bank, a payment processor is supposed to transmit the funds, less the payment processor's fee (usually a % of the gross amount), by bank transfer back to the merchants, representing the net payment from its customers for the merchant's products and services. (*Id.* at ¶ 7.) In this role, transmitting amounts to the merchants, from the card payments of their respective customers, has been referred to in the e-commerce industry as a "paymaster" function. (*Id.*) As is apparent from this explanation, there are four main parties to a typical merchant transaction:

- The merchant;
- The facilitator (Affinitas);
- The payment processor (i.e., paymaster); and
- A bank (which sends and receives funds from the customers' purchases).

(*Id.*) As part of its operations, Affinitas seeks out new and innovative payment processing solutions for its client merchants, which is ultimately how the underlying dispute came to pass. (*Id.* at ¶ 8.)

### C.   Affinitas Engages New Line Processing, Zed Payments and Morgan as Payment Processors

In the Spring of 2020, Affinitas was hired by various merchants to implement and manage their online payment processing needs. (*Id*. at ¶ 9.) Affinitas then set out to find the appropriate payment processing partner for its client merchants. (*Id*.) Affinitas was eventually referred to New Line Processing and their affiliate Zed Payments. (*Id*. at ¶ 10.)

Affinitas was also referred to a Canadian named Maxwell Dean Morgan and another individual, Michael A. Harris. Morgan and Harris advised Affinitas that they represented an entity called Zed Payments. (*Id*. at ¶ 11.) Morgan represented to Affinitas that Zed Payments was a payment processing solution provider (i.e. paymaster) that had formed direct relationships with reputable banks that were able to process the financial transactions of Affinitas' merchants. (*Id*.) Morgan further represented to Affinitas that he ultimately controlled the business and technical operations of Zed Payments, which he held out to be commercially registered in the Philippines and a provider of global payment processing solutions. (*Id*.)

Following the introduction of Affinitas to Respondent, Zed Payments and Morgan, and after discussing Affinitas' merchant needs, Zed Payments recommended to Affinitas the payment processing solution be provided by Zed Payments through Morgan. (*Id*. at ¶ 12.)

Among other reasons, Affinitas agreed to do business with Zed Payments because, as noted above, they represented that they had a direct, established arrangement with reputable bankers, and were able to process Affinitas' merchant transactions. (*Id*. at ¶ 13.) The credit and debit card payments of Affinitas' merchants were to be transacted through Zed Payment's electronic gateway. (*Id*.) Affinitas effectively acted as a "reseller" of Zed Payment's payment processing services through an integrated electronic gateway ("solution"). (*Id*.) Zed Payments conducted the function of a "paymaster" to Affinitas' merchants by disbursing the processed payments to the merchants, less the respective fees of Respondent, Zed Payments and Affinitas. (*Id*.)

///

///

### D.      Issues with Missing and Outstanding Transactions

Throughout June 2020, Affinitas coordinated with Zed Payments and New Line Processing to complete the technical integration of the Zed Payments payment processing solution for Affinitas' merchants.  (*Id*. at ¶ 14.)

On or about June 16, 2020, the technical integration between Affinitas' merchant accounts and the Zed Payments payment processing solution was completed.  (*Id*. at ¶ 15.)  The Affinitas' merchant online payment processing capabilities "went live," and Affinitas' merchants started generating online sales of their goods and services.  (*Id*.)  On July 17, 2020, the contractual terms of the agreement between Affinitas and Zed Payments was formalized in a written agreement.  (*Id*.)

Over the following 60 days (between June and August 2020), Affinitas did not receive timely payments from Zed Payments.  (*Id*. at ¶ 16.)  Indeed, the net total amount that should have been paid to Affinitas' merchants was $1,520,587.51.  (*Id*.)  The actual amount paid was $483,190.11 (less than 32% of what was owed).  (*Id*.)  By August 2020, the total outstanding balance due to Affinitas' merchants had grown to over $1,037,397.40, made up of two categories:

a) "Missing" Wire Transfers: missing (or lost) wire transfers represented wire transfer payments which defendants claimed had been sent to Affinitas' merchants, and for which Affinitas was provided "wire transfer confirmation" documents from Morgan, but which funds were never received by those merchants.  (*Id*.)  To date, the total amount of "missing" wire transfers is $290,343.27; and

b) "Outstanding" Transfers: outstanding transfers represented those funds due and owed to Affinitas' merchants which have not been remitted (and which defendants have not claimed have been remitted).  (*Id*.)  To date, the total amount of "outstanding" transfers due to Affinitas' merchants is $747,054.13.  (*Id*.)

In addition to the missing and outstanding transfers as set out above, the Affinitas merchants were also entitled to the return of $183,079.35 in reserve funds per the terms of the agreement between the parties, which were initially held back for six months and due to

1   Affinitas by February 2021.  (*Id*. at ¶ 17.)  To date, the reserve funds that were required to be
2   returned to Affinitas are also outstanding.  (*Id*.)

3         **E.**      **Morgan's Claims of "Banking Issues"**

4         In response to these issues, Affinitas exchanged email communications with New Line
5   and Morgan regarding the reasons for the delay in payment to Affinitas' merchants.  (*Id*. at ¶
6   18.)  On many occasions, Affinitas requested detailed information from Morgan and New Line
7   to trace the merchants' wire payments.  (*Id*.)  But Morgan refused and/or failed to provide the
8   requested detailed information.  (*Id*.)

9         Morgan's representation that the cause for delay was due to "banking issues" was
10  concerning to Affinitas, as the reason why Affinitas engaged Morgan and Zed Payments in the
11  first place was due to their purported relationships with reputable banking institutions.  (*Id*. at ¶
12  19.)  Affinitas relied on Morgan's representations that he was actively seeking solutions to the
13  delayed payments.  (*Id*.)

14        Over the next few weeks, Affinitas grew increasingly unhappy with Zed Payments and
15  Morgan's performance, and Affinitas' merchants were concerned that the processed funds were
16  not being received on a timely basis in line with the agreement.  (*Id*. at ¶ 20.)  Affinitas reported
17  to Morgan that unless and until the missing wire transfers and outstanding transfers were
18  resolved, the merchants would stop processing payments.  (*Id*.)  Morgan continued to represent
19  to the Affinitas that the delay in payment was due to banking issues and delays outside of their
20  control.  (*Id*.)

21        Eventually, Morgan would go on to claim that a previously unidentified entity known as
22  "Blade Payments" (also known as BladePayments or Bladepayments) was actually responsible
23  for the delays, purportedly acting as a "rogue" business partner that he claimed owned 251
24  Ontario.  (*Id*. at ¶ 21.)  For example, on July 28, 2020, Affinitas received an email in which
25  Morgan represented to Affinitas that the "acquirer" of Affinitas' merchants' funds was Blade
26  Payments and that Blade Payments was "registered under ND Group LLC in California."  (*Id*.)

27        The claims regarding Blade Payments would ultimately prove to be bogus in the light of
28  day, and it appears that Morgan simply concocted Blade Payments to serve as a scapegoat,

while further referring to likely fake company representatives that he claimed to be communicating with named Devin Crosby, Nathan Joseph, Damon Porter and Cheryl Richards. (*Id.* at ¶ 22) Other suspected dummy companies include "Baazel Max Advertising," "Elevation Management," and "Roberge Oil Markings," which Respondent and Morgan either claimed to be additional entities they had "identified" that were "attached to Blade Payments" or appeared as descriptors used in some of the successfully processed payments. (*Id.*)

Ultimately, Morgan pledged to repay the approximately $1 million owed to Affinitas pursuant to a payment schedule. (*Id.* at ¶ 23.) In truth, only one payment was ever made—approximately $110,000 wired on August 21, 2020. (*Id.*) After a few more weeks of delay tactics and shameless falsehoods, communications between the parties broke down completely. (*Id.*)

### F.    Current Foreign Proceeding and Connection to Respondent Slack

On June 11, 2021, Applicant brought a legal action against Morgan and various other related entities in the Ontario Superior Court of Justice.[1] (Lee Decl. at ¶ 6; Ex. A to Lee Decl.) Applicant alleges claims of fraud, breach of trust, conversion, conspiracy, and unjust enrichment, among others, and seeks punitive, exemplary, and aggravated damages against Morgan and the other defendants, including Morgan's co-fraudster, Tricia Edwards. (Ex. A to Lee Decl.)

On June 14, 2021, the Honorable Justice Myers of the Ontario Superior Court of Justice further granted the APO that permitted Applicant to enter and remain in the residence of defendants for the purpose of identifying, inspecting, removing and preserving certain evidence believed to be at risk of destruction or spoliation. (*Id.* at ¶ 7; Ex. B to Lee Decl.)   Among other things, this Order reached evidence stored on electronics and/or communications services such as those offered by Respondent. (Ex. B to Lee Decl.) As is relevant here, Morgan was also

---

[1] The case is captioned as *277 Ontario Inc. v. Maxwell Dean Morgan, et al.*, Court File No. CV-21-00663862-0000.

1    ordered to not directly or indirectly "touch, activate, or operate any computer equipment either

2    locally or remotely from any location, or access or alter any text, graphics, electronic data,

3    information, or other content of any web site or its databases or any electronic mail, newsgroup

4    or Internet relay chat communications, or other information, instructions or data stored in any

5    location remote from the Named Premises that may contain or constitute the evidence." (*Id.*)

6         On June 15, 2021, the APO was executed on Morgan and Edwards, and proceeded at

7    their personal residences. (Lee Decl. at ¶ 9.) On July 28, 2021, the Independent Supervising

8    Solicitor produced an affidavit containing the report from data forensics firm Net-Patrol

9    International Inc. ("the NPI Report"). (*Id.* at ¶ 10.) The NPI Report made numerous findings

10   with respect to the issue of concealment, non-disclosure and potential spoliation within various

11   accounts used by Morgan and Edwards. (*Id.* at ¶ 11.) Among those findings was evidence that

12   Morgan and Edwards improperly concealed or destroyed evidence related to use of Slack,

13   including evidence that: (a) "[t]he Slack program is used constantly in the operation of [Morgan

14   and Edwards' payment processing business];" (b) Morgan and Edwards used Slack up to seven

15   minutes before the execution of the APO, but both Defendants failed to submit their Slack

16   accounts for forensic review as required by the Order; and (c) Morgan deleted the Slack

17   application from his mobile phone, and deleted a Slack desktop shortcut in advance of execution

18   of the APO. (*Id.*)

19        Put differently, the analysis of Morgan and Edwards' electronic devices and other

20   accounts revealed that they used Respondent Slack's services for the purpose of conducting the

21   payment processing scheme and transmitting documents related to the funds due and owing to

22   Applicant. (*Id.* at ¶ 12.) As such, all indications are that Morgan and Edwards took the above-

23   referenced actions in an attempt to frustrate discovery (in clear violation of a court order) and

24   Applicant's efforts to recover the funds due and owing. These actions, as well as other attempts

25   by Morgan and/or Edwards to destroy, conceal, alter, or fail to disclose electronically stored

26   information covered by the APO are the subject of a pending Motion for Contempt in the

27   Ontario Superior Court of Justice. (*Id.* at ¶ 13.)

28   ///

## III.   THE CONTEMPLATED DISCOVERY

Applicant now seeks the assistance of this Court in obtaining information critical to its efforts to recover the funds owed to it.

As referenced above, the forensic analysis completed by NPI indicates that Morgan and Edwards improperly accessed and/or altered information pertaining to their use of Respondent's services.  As such, Applicant believes Respondent to possess information related to spoliation by Morgan and Edwards.  (*Id*. at ¶ 14.)  It also must be noted that such information will likely be unavailable from any other source—Applicant has retained the services of a qualified forensic expert to obtain any and all data that is available from the electronic devices collected from Morgan and Edwards, and that expert has concluded that further data can only be obtained from Respondent Slack.  (*Id.*)

For the avoidance of doubt, Applicant does not seek the *contents* of any communications sent or received by Morgan using Respondent's services, but rather, the non-content data related to Morgan and Edwards' spoliation attempts through impermissible changes to settings and accounts related to their use of Slack's services.  (*Id*. at ¶ 15.)

Respondent Slack Technologies, Inc. is headquartered at 500 Howard Street, San Francisco, CA, 94105, United States.  (*Id*. at ¶ 16.)  A copy of Applicant's proposed discovery is attached to the Lee Declaration as **Exhibit C**.  A subpoena for the production of documents is attached to the Lee Declaration as **Exhibit D.**

## IV.   277 ONTARIO'S LOCATION

277 Ontario is a pseudonym for 2770095 Ontario Inc. which is a corporation operating pursuant to the laws of Ontario, Canada.  277 Ontario was incorporated on August 5, 2020, with a registered office in Toronto, Ontario.

## V.   THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS

28 U.S.C. §1782(a) provides:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal.  The order may be made pursuant to ... the application of any interested person…

The fundamental purpose of §1782 is to provide a procedure whereby a qualified applicant may obtain "federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004).  "Any interested person" includes litigants before foreign or international tribunals, and includes corporate entities as well as natural persons. *Id.* at 256; *see Akebia Therapeutics, Inc. v. FibroGen, Inc.*, 793 F.3d 1108, 1110 (9th Cir. 2015).

The policy behind §1782 is to "assist foreign tribunals in obtaining relevant information that the tribunals may find useful, but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Intel,* at 262.  The "prima facie showing mandated by the statute is that the application be made (1) 'by a foreign or international tribunal' or 'any interested person,' (2) that it be 'for use in a proceeding in a foreign or international tribunal,' and (3) that the person or entity from whom the discovery is sought be a resident of or be found in the district in which the application is filed." *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998); *Republic of Kazakhstan v. Biedermann Int'l,* 168 F.3d 880, 881 (5th Cir. 1999).

### A.    Applicant is an "Interested Person"

As a Plaintiff in foreign litigation, 277 Ontario satisfies the "interested person" requirement of Section 1782.  *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke Section 1782."); *see also John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132 (3d Cir. 1985) (a party to foreign litigation is an interested person under Section 1782).

### B.    The Requested Discovery Is for Use in Conjunction with Proceedings Before a Foreign Tribunal

As discussed above, Applicant seeks discovery from Respondent to help understand the nature of any changes made by Morgan and Edwards to electronically stored information maintained in their Slack accounts, as well as to assist in the tracing and recovery of Affinitas' funds.  Such information is directly sought "for use in a proceeding in a foreign or international tribunal"—namely, an active proceeding in Ontario, Canada—as required by Section 1782.

///

### C.      Respondent Slack Can Be Found in the Northern District of California

Slack is headquartered in San Francisco, California.  (Lee Decl. at ¶ 16.)  Therefore, Respondent is within this Court's jurisdiction and subject to its authority over the requested discovery sought in this Application.

### D.      Discretionary Considerations Merit Granting This Application

In addition, certain discretionary factors that "bear consideration in a ruling on a §1782 request" also favor granting the instant Application.  *See, Intel,* 542 U.S. at 264-65.  These include:

(1)     Whether the person from whom discovery is sought is a non-participant to the foreign proceeding thereby making the need for the aid more apparent;

(2)     The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or court abroad to federal court judicial assistance;

(3)     Whether the §1782 application for discovery is an attempt to circumvent the foreign proceeding or undermine foreign laws;

(4)     Whether granting discovery that is narrowly tailored is consistent with the aims of the statute to promote efficiency and reciprocity.

Here, each of these discretionary factors weighs in favor of granting the Application.

First, Applicant's need for the discovery from Respondent by means of §1782(a) is heightened by the fact that it is not party to the proceeding currently occurring in Canada.

As the Supreme Court noted: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel,* 542 U.S. at 264-65.  As such, relief under §1782(a) may not be warranted where the relevant tribunal does not need the assistance.  *Id.*  In contrast, here, Respondent possesses evidence relevant in the foreign proceedings, but will not be a party there.  Indeed, Respondent will not be brought before any foreign tribunal for the purpose of obtaining the evidence currently in its possession, nor is the discovery sought  from it within the jurisdictional reach of the courts of Canada.  Nonetheless, ///

documents in its possession and their testimony are squarely relevant to Applicant's claims in Canada.  This weighs in favor of granting the Application.

Second, there is no reason to believe that the Ontario Superior Court of Justice would be unreceptive to this Court's grant of the discovery sought.  Canada is a party to the New York Convention.  Therefore, there is no reason to believe that those courts would object to this Court's assistance with discovery that will, by providing information concerning the transfers of Applicant's funds, facilitate the foreign proceedings and the potential recovery of those funds.

Further, the courts have held that the liberal policy of granting assistance favors allowing a petitioner the discovery sought so that the foreign court itself may determine the admissibility or relevance of the evidence obtained.  *See In re Euromepa S.A.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995) (explaining that "a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," and that "[a]bsent this type of clear directive, however, a district court's ruling should be informed by section 1782's overarching interest in 'providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects.'"); *In re Application of Grupo Qummam*, No. M 8-85 (DC), 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005) ("The Mexican court, rather than this Court, should decide whether the additional evidence is admissible, and it will be in a better position to do so if Qumma is permitted to conduct the requested discovery first.").

Third, the discovery is centrally relevant to the proceeding in Canada, and would not conflict with or circumvent any foreign proof-gathering restrictions.  Courts have interpreted this discretionary factor as an inquiry into the petitioner's good faith: "[A] district court could consider whether the §1782(a) request conceals an attempt to circumvent foreign-proof gathering restriction or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 264-65; *see, also, In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf,* Case No. Ml 9-88, 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006).  Applicant's request here is made in good faith and not for purposes of harassment.  *See, Brandi-Dohorn v. IKB Deutsch*

1   *Industriebank AG,* 673 F.3d 76, 81 (2d Cir. 2012).  Thus, 28 U.S.C. §1782 is a proper and

2   necessary method by which to obtain the critical evidence sought by Applicant.

3   Fourth and finally, any discovery under the subpoenas will not be onerous for

4   Respondent.  Courts may consider whether the discovery requests under § 1782 are "unduly

5   intrusive or burdensome" and should be "rejected or trimmed."  *Intel,* 542 U.S. at 265.  In this

6   instance, Applicant seeks information and documents from Respondent narrowly tailored to

7   information concerning discrete Slack accounts under the control of Morgan and Edwards.

8   Moreover, the requested discovery does not seek voluminous communications, but rather,

9   discrete non-content data and information (e.g., account deletion, login data, etc.) regarding

10  Morgan and Edwards' use of Slack's services.  It is unlikely that such information or

11  documentation would be voluminous or difficult to search for and produce.  Accordingly, this

12  factor also weighs in favor of granting the instant Application.

13  **VI.   CONCLUSION**

14  Based on the foregoing, Applicant respectfully requests that this Court grant the instant

15  Application in its entirety.

16   Dated: January 10, 2022                    **LAW OFFICES OF MICHAEL JASON LEE, APLC**

17                                              */s/ Michael Jason Lee*

18                                              Michael Jason Lee, Esq.
                                                Michael@mjllaw.com

19                                              Attorney for Applicant, 2770095 Ontario, Inc.

20                                              **DILLON MILLER AHUJA & BOSS, LLP**

21

22                                              /s/ *Christopher J. Beal, Esq.* (*with permission*)

23                                              Christopher J. Beal, Esq
                                                cbeal@dmablaw.com

24                                              Attorney for Applicant, 2770095 Ontario, Inc.

25

26

27

28